23-2401 Eden Foods v. Stewart 23-2401. My client, Eden Foods, is a half century old institution in the field of natural, holistic consumable goods. For almost 60 years now, Eden Foods has built a massive brand, totaling 300 different products and related services all centered around a family of Eden Formative Marks and you have 300 goods and what portion of those are at issue here with respect to the dietary supplement? So we've made two separate arguments here, Your Honor. We own decades old, incontestable trademark registrations for legally identical goods, dietary supplements. There are two registrations to that effect that are for the word mark Eden and we believe that the errors in the court's decision, if they were corrected, reversal is appropriate just based on those two registrations. But in addition to that, we have also asserted our larger family of Eden Formative Marks that enjoys a wide degree of commercial renown such that it has been recognized in the past as being a strong family of marks that are afforded broad protections. But the key here is the similarity of marks, right? The key issue for the TTAP was. That was one of the primary issues, though that issue was repeatedly informed by their impression of the commercial strength of the mark and with respect to the commercial strength, that larger portfolio is highly relevant because of the high degree of renown that the brand enjoys. Well, why don't you talk a little bit about the likelihood of confusion based on the dissimilarity of the marks and that's a major factor, right? And you're disputing that because. We are disputing that, Your Honor. We are disputing that because the board's perception of dissimilarity was based on an error of fact. The substantial evidence does not support the conclusion that the board drew. The board acknowledged right out of the gate that Eden Foods registered incontestable mark has been wholly incorporated into the Adam and Eden Formulations mark. The board acknowledged that the marks were similar in both sight and sound. Where the board found differences was connotation and as a result, overall commercial impression. The factual record does not support the conclusions that the board drew regarding connotation. Particularly, the board cabined Eden Foods mark as being defined as a place referring to the Garden of Eden, whereas the Appellee's mark was. Well, you didn't dispute that Eden had the connotation of the Garden of Eden. So why was the board incorrect to say this is a place? We don't dispute that it evokes the Garden of Eden. Our position is that. And is the Garden of Eden a place? It is a place. It is, as the dictionary definition that the board relied on, it is more than a place. It is a place. It is a general sense of paradise. And it is more metaphorical qualities that are associated with that place, such as innocence and bliss. We had put into the record testimony of both parties' corporate witnesses, where they discussed that the mark was intended to evoke the ideas of Eden, rather than necessarily just a place. The other issue with the board's definition was that it identified the Adam and Eden Formulations mark with simply the inhabitants of Eden, and suggested that these were two totally separate commercial impressions. But the dictionary definition on which they relied expressly references Adam and Eve as the reference. So how would you articulate your argument, because I'm getting a little confused. You agree Garden of Eden is a place, Adam and Eve are the inhabitants of the Garden of Eden. And are you saying that's the same thing? We're saying that there's a related connotation between the two. And to find that based on a connotation that by their own judicially noticed dictionary definition references both things, to say that they are so distinct as to find that there is dissimilarity, despite also acknowledging similarity in sight and sound, which alone could be sufficient to find similarity here. When that connotative relationship that is clearly evidenced by the evidence of record is combined with the board's acknowledgments regarding sight and sound, the substantial evidence does not support the board's conclusion of greater dissimilarity than similarity with respect to these marks. The other point that I believe is related to this, Your Honor, is the question of commercial weakness. That the board acknowledged that the Eden mark with respect to supplement goods was conceptually strong, but found that it was commercially weak such that it should be afforded a narrower scope of protections, a scope of protections that would only exclude strikingly similar marks. That decision was based on legal error. It was a misapplication of this court's precedent in Juice Generation and the follow-on precedent in Jack Wolfskin. The board found that the mark was commercially weak based on eight internet screenshots of purported unregistered uses, seven of which were simply screenshots from Amazon.com, one of which was the user's independent e-commerce site. There was no evidence considered by the board. And these are by other people, right? Correct. And your main argument here seems to be a kind of a numbers thing. I mean, is that what it is, that in the other cases you cite there were 26, there were more numbers? How are we supposed to evaluate that on a substantial evidence review? We don't consider it a numbers thing, Your Honor. We believe that while the numbers are relevant, the case law is clear that in order for third-party references to speak meaningfully about the commercial strength of an existing mark, there must be evidence of consumer awareness of those third-party references. Otherwise, they wouldn't in any way impact how consumers perceive the source-identifying significance of the mark at issue. Because of that, it's been this court's long-standing precedent that the probative value of third-party trademarks depends entirely on their usage, and that's the 2005 case Paul May imports. In the cases that the board cites, juice generation particularly, the board found, or sorry, I apologize, this court found that there can be instances in which third-party uses are so considerable that their mere existence on their face has some degree of probative value, even if the person offering the references didn't go through their paces of proving up how consumers evaluate every single one of those uses. In Jack Wolfskin, this court went on to define that that degree of use is ubiquitous. And so we... So what is the... Are you making a legal argument? Is there some legal standard that wasn't found? Because the TTAP sees these cases every day. We see very few, and there's a substantial evidence review if that's what we're talking about. So evaluating the quantity and where is the line being drawn is kind of hard to do on appeal. So are you suggesting there's... What is the legal standard? We aren't saying that there is a legal error here, because the controlling law in this situation is that of Palm Bay Imports, that without proof of how consumers actually perceive these third-party references, they are not competent evidence of commercial strength. The precedent on which the board relied was inapposite. So it was a legal error to apply juice generation, because it only applies where there is use that can be considered ubiquitous, such that the mere existence of these uses is relevant on its face. I would note, however, Your Honors, that juice generation didn't find that this ubiquitous use suggests that a mark is always weak, but rather they simply remanded for the board to consider that evidence. The way you framed this... I'm sorry. No, please. The way you framed this in your statement of the issues was that the board held that the opposer was not required to submit evidence of consumer awareness, but the screenshots included thousands of user reviews. Isn't that evidence of consumer awareness? Two issues there, Your Honor. Number one is that that is not something that the board considered in its decision, and in fact, when it responded to our citing of Palm Bay imports to show that these were not relevant to the consideration, it specifically said it didn't need to consider that third-party usage. And the second issue is that while there is some data available from those screenshots, it's not competent evidence regarding the strength of a U.S. trademark. There is case law from this court that says the only relevant consumers when assessing a U.S. trademark are U.S. consumers, and that evidence on the face of the screenshots has no differentiation as to the types of consumers there. And so it is not competent evidence of U.S. consumer exposure to these trademarks. Your Honor, our position is that the board's application of juice generation here was a legal error, and it broadened juice generation to the point that it effectively overruled the longstanding precedent of Palm Bay imports regarding what constitutes probative evidence of the commercial strength of a mark. When you take away the legal error regarding strength, these marks the board acknowledges are entitled to the normal scope of protections that an inherently strong mark would be. Its decision on similarity was expressly influenced by its finding that these marks were only entitled to a narrow scope of evidence. So both its conclusion regarding similarity and its overall conclusion regarding a likelihood of confusion were expressly influenced by this legal error in assessing strength. When you take away those legal errors, what we are left with is the board's acknowledgment that the party's marks are directed to legally identical goods, and that is a factor that it acknowledged weighed heavily in favor of a likelihood of confusion. We are left with the finding of a conceptually strong mark. We're left with the finding of visual and phonetic similarities between the party's  We're left with marks that move in the same channels of trade and marks that are sold to the same consumer base. Once the errors that we've discussed here are corrected, literally everything else that the board considered weighs in favor of a finding of likelihood of confusion. Your Honor, I see I'm in my rebuttal time, so I'm happy to take questions or take my seat. Okay, thank you, counsel. Counsel, please proceed. Thank you, Chief Judge Moore, and may it please the Court. I'd like to start where my friend started on the issue of the similarity or dissimilarity of the marks, as I think that's largely dispositive of the issues in this appeal. Our position is that in comparing the marks, the board applied the correct legal test, properly considered the marks as a whole, and its conclusion that the marks are dissimilar based largely on the undisputed wordplay in the applied-for mark is supported by substantial evidence. I take my friend's argument to be that the board incorrectly relied on a dictionary definition that the board had judicially noticed. Let's say, hypothetically, one of the marks was Garden of Eden, rather than just Eden, and the other mark was Adam and Eve. You think that would be the same result? I think that would make a big difference, because I think the board focused in on the wordplay of the applied-for mark. So the board recognized that what people walk away, what consumers walk away from from the applied-for mark is the wordplay relative to... I don't know what wordplay means, but the wordplay is Adam and Eve in the Garden of Eden, and they've truncated that? Is that what we're calling wordplay here? What we're calling wordplay here is, in place of where you would expect Eve, you get the word Eden. And so that kind of incongruous combination of Eden, where you wouldn't expect it, is the wordplay that the board was focused on. But what is the connotation of the wordplay? It's Adam in the Garden of Eden, right? So the connotation... Adam and Eve in the Garden of Eden. Correct. So it is a wordplay on those two inhabitants. So the connotation of commercial impression is a wordplay on Adam and Eve. So if we had Garden of Eden versus Adam and Eve in the Garden of Eden, you'd think the conclusion would be the same? I think that difference would heavily factor into the board's analysis, because, again, in that situation, there isn't a wordplay, which I think factored heavily into the board's analysis here. And you think the wordplay makes it more interesting, different, and just recognizable? Yes, absolutely, especially the last part there. I think what the board is saying is that that's what consumers walk away from. Obviously, the Eve mark does not include any sort of wordplay, but the Adam and Eden formulations mark does include this wordplay. What about the argument we spoke with your friend about for five minutes about the commercial strength and what the board did, just listing those references, and that seems contrary to law to our precedent? So our position on the third-party use is that this court is confronted with a legal question, which is, in circumstances where the specific extent and usage is not fully proven, is there some sort of lower bound in their number of uses that must be met before a factfinder can consider the face of the evidence before it? Our position is that this court's more recent precedent, Induced Generation, Jack Wolfskin, and Spiron, don't speak to a lower bound. What they speak to is kind of a more general proposition that even when the extent and usage is not specifically shown, a factfinder should still consider the face of the evidence before it. So that's a legal... I mean, what about the factual question? Was there sufficient evidence to establish the board's conclusion? So in this case, based on the record before it, the board found that the eight third-party uses here were sufficient to show usage to a non-trivial extent. And our position is that that finding is supported by substantial evidence. So you're using the phrase non-trivial, your friend used the word ubiquitous. Are both of those words found in our case law? So ubiquitous... There's a big difference between ubiquitous and non-trivial. Of course. There's definitely a large difference between the two. Ubiquitous is from Jack Wolfskin. Non-trivial is what the board found. And I think that difference is important, because the board didn't go as far as this court did in Jack Wolfskin. So Jack Wolfskin certainly had more third-party uses. And correspondingly, the... Well, is non-trivial, is that sufficient to meet the legal test? The legal test as to, like, admissibility? No, in terms of the board's evaluation and crediting that based on the numbers. I think it is sufficient to meet the legal test. In as much as the board found commercial weakness not to be... So commercial weakness, just like commercial strength, is on a spectrum. And the board didn't go as far as this court did in, for example, Jack Wolfskin, in saying that consumers were able to distinguish similar paw prints. The board simply found that there was used to a non-trivial extent. And what that meant was that an overlap in the word even isn't enough. That a simple overlap in the word even is not enough to show likelihood of confusion. And so it's our position that that is a lesser amount of commercial weakness than Jack Wolfskin. What about some of the concerns raised in your friend's brief about the procedural errors that occurred here? I mean, the board mistakenly said, I don't remember the exact details of this, but saying that we couldn't admit it or we couldn't credit it because there was no time stamp or no date stamp. And there was. The board was wrong about that, right? So I think that goes to the issue of the family of marks. And so there's four broad categories of evidence with respect to the family of marks. The product catalog, the newsletters, the print ads, and the press releases. So for the newsletters, the board said that there wasn't sufficient information on the face of the newsletters to show the appropriate date. Okay, but what's your response to that? Because that's objectively wrong. Objectively, unequivocally wrong. The publication dates and the copyright dates are right there on the documents. So the board got that completely wrong. So what's your response? So our response to that is that the board... Appellant forfeited the reliance on the newsletters. So that exhibit includes, I think, 105 pages and has 45 newsletters. They're not contending that all of them are dated or that all of them have sufficient information. And it's our position that by not specifically citing the newsletters that had the dates... What? That makes no sense. They cited particular newsletters to the board. The board disregarded all of them, saying they had no dates. Some of them had dates. So how is it they forfeited that? Your argument makes no sense. And I don't even think you even argued that forfeiture on this point either. So we did argue forfeiture for this. And for the newsletters, there isn't a specific pin site. So there's specific pin sites to the product catalog, the print ads, and the press releases. There is not a specific pin site in their briefing to the board to the newsletters. And so we think that... So your only argument then is forfeiture. So if I don't think that they forfeited it the way that they argued it below, what response do you have to the fact that... Do you disagree that these newsletters actually do contain dates, contrary to the board's statement? So the ones that they've cited on appeal... Because we can walk through them if you want. Of course. And certainly, I don't dispute that the ones that they've cited on appeal do include dates. The board, for the newsletters, did provide two bases for rejecting that evidence. One was the date, and the other was the extent of the distribution. There was no evidence as to how widely those newsletters were distributed. And then taking the next category of evidence, the print ads. Those print ads, Your Honor, as you noted, they do include a copyright notice. But we argued in our brief that the copyright notices are not indications of use. And they haven't responded to that argument as far as I know in the reply brief. So it's our position that, in addition to a forfeiture argument for many of those... What about the press releases and the fact that the board incorrectly said the press releases, quote, only reflect the accolades of a single good for each release without demonstrating the opposer as a family of Eden formative marks. That's a direct quote from page 815. And Eden Foods, pretty persuasively, in its brief on 56 to 58, and its gray brief at 29, indicate that many of these press releases, clearly on their face, relate to multiple goods bearing the Eden formative marks. So it seems like yet another factual error by the board, where it rejects evidence for a reason that's completely inconsistent with the face of the evidence itself. So I guess I would resist a little bit there. I think most of the newsletters... I'm sorry, most of the press releases did reflect accolades for a particular good. So there may have been other references to, like, Eden recipes in a kind of boilerplate at the end. But the press releases themselves, for the most part... I'm not talking about... I'm talking... I'm sorry, I'm sorry. Are you telling me the press releases that they cite on page 56 to 58 of their brief, which I have right in front of me right now, that those press releases do not, in fact, relate to multiple Eden goods? How many press releases? 1, 2, 3, 4, 5, 6, 7, 8, 9, 10. You're bullet-pointed. 11, 12, 13, 14, 15, 16, 17, 18, 19. Hold on, I'm not done yet. Oh yeah, 19. They cite 19 specific press releases, each one of which, by my own review of the appendix, relate to multiple Eden goods. But we have a single sentence in the board opinion rejecting all press releases, saying each one pertains only to one good. So what do we do about that mistake the board made? Because on its face, I don't see how that's not an error. So two responses to that, Your Honor. First, the press releases that appellants cited to the board, the exemplary citations, they did, in fact, relate to one. I'm sorry, I can't... They did relate to one? They did relate to one. So you're saying the board was right about that? The ones that were specifically cited to them. Yes, but? But, and so for the other ones that may have related to multiple goods, I think that there, I think our forfeiture argument again applies, that they did not cite the other press releases specifically in their briefs to the board. And I think that even if this court disagrees with the family finding as a matter of substantial... Okay, what my law clerk just says is that you're wrong. What you're representing to us is wrong. He says all of those press releases may be discussing an award one by one good, but then goes on in the releases to discuss multiple marks and multiple goods in every one of the press releases. So is my law clerk wrong? He might be. No, I'm not disagreeing with that at all. What we're saying is that the board's finding was that the accolades themselves relate to one good. The board wasn't saying that there was no, there wasn't any discussion about multiple marks. There's a question about whether Eden has a family of marks, right, before the board? And the board disregarded broad swaths of evidence that was in fact presented to it on this point. And your, what is your argument for why it's not prejudicial that the board wrongly said it was okay to disregard all of these 19 press releases even though they discuss multiple Eden marks, i.e. tend to support their argument about a family? Why was it okay to disregard all of those? And the only explanation given was each release only discusses one mark? So why is it okay to disregard this evidence of, in terms of establishing a family of marks? Well, I think, I guess I would reiterate the board's finding wasn't that they don't, that there was no mention of any of the marks. The board's finding was that they relate to, they relate to an accolade for a single good. But I think that... Can you give me a page number here for the board? For the board's finding? Yeah, please. I'll help you out. It's A15. A15. A15. And it spans to A16. I'm sorry? 15 to 16. Okay, and you're saying that the board rejected it because... So just reading from the board's decision... The press release is reflecting the awards Opposer has received for its goods only reflect the accolades for a single good. And without demonstrating the Opposer possesses a family of Eden formative marks. Does the mark have to get an accolade to be part of the family? No. So each of these press releases demonstrates multiple goods with the Eden name on them. It might only be touting an award given to one particular good. But how could the board disregard the rest of the press release which shows the family of marks? This one sentence says, oh, these press releases, we don't have to give any weight to these because they only tout advantages of one good and don't demonstrate a family of goods. But that's false. They demonstrate a family of goods because each of those press releases demonstrate multiple marks with the Eden, multiple different goods with multiple different Eden marks. So how is that not all erroneous? Well, Your Honor, I don't think the board was disregarding the evidence. I think the board still considered the face of the evidence before and found it not persuasive on its face to show ownership of a family of marks. But I think that even if this court disagrees with, as a matter of substantial evidence, the family of marks finding, I think that I think that and we made this argument in our brief that the family of marks finding did not prejudice the appellate hearing because there's no indication that the result would have been any different. Kind of coming back to where I started, this decision, in our view, really hinges on the differences in the marks. But your view doesn't matter. What matters is what the board said. So what did the board say that supports what you're arguing now? Because you can't come in under Chenery as the government and argue something different than what the board said. So I think there might be stuff in the board opinion that supports what you're saying. So don't tell me your view, tell me what the board said that indicates that. So on Appendix 32, the board sets out its conclusion. Okay, what do you want me to look at? Appendix 32. First full paragraph, second sentence. The board says, We find that while opposer and applicants' goods at issue are legally identical in part and would travel in the same overlapping trade channels and would be offered to the same overlapping consumers, we nonetheless conclude that the parties' respective marks are sufficiently dissimilar in connotation and overall commercial impression to weigh against the conclusion that confusion was likely. Well, I don't, I mean, she's disputing that, but say I agree with you that that weighs against, but what about all the stuff that weighs in favor of? What do we do with that? Like, I'm confused. Your Honor, I see my time has lapsed. We're going to keep here for a little longer. Okay, sure. Thank you, Your Honor. So two points of response, Your Honor. None of those other factors, so what the board is saying here is those factors that favored a likelihood of confusion did not outweigh, could not outweigh the... Where do they say that? That's how I read the sentence. That these factors that favored a finding of likelihood of confusion did not outweigh... Well, it says trade channels and overlapping classes of consumers. It credited those two things that weighed in favor of likelihood of confusion and said when balancing those two on the scale against the dissimilar marks, dissimilar wins, there's no likelihood of confusion. But what happens if in addition, how do we know for sure if the board would have reached the same conclusion if in addition to on this side of the scale having overlapping trade channels and having classes of consumers, it also had family of marks and also had, you know, press releases and newsletters which they did not consider would that tip the scale? How do we know it wouldn't tip the scale? So, Your Honor, there are two principal benefits to establishing a family of marks. One is that the differences in goods are given less weight. And here, the board is finding identical. So that would not have that impact. The other is that the non-common element parts of the marks the differences there are given less weight. And again, that would have no impact here because the mark at issue is just even. So both of the benefits you get from establishing a family of marks would not have an impact here. And I think that my friend would argue that the way the family of marks might have an impact is through commercial strength. But here, the board is not using commercial strength as a basis for finding a no likelihood of confusion. The board is comparing the marks without that argument. Could the commercial strength argument ever go in favor of no likelihood of confusion? I think it could. So theoretically you could expand the scope of protection if you were to find a mark more commercially strong. But I think our position on that point is that they haven't shown that whether you look at it as a family or you look at each individual mark that the commercial strength evidence is any stronger for is any stronger in either way. So the commercial strength the board found four deficiencies with respect to commercial strength. No explanation on ad spend. No explanation on revenues. No discussion of the my apologies. That's okay. I think we have your argument. Thank you. Let's have the rebuttal time for Ms. Kozak. Your Honors, I'd like to start out with       I have to vehemently disagree with my friend that the  strength of the family of  would not have an impact here. First of all the evidence of the commercial strength of the  family of  is copious. The problem is we have what looks like a fact finding by the board at footnote 34 page 17 and that fact finding says even if the opposer were to  a family of formative marks we find the structure of  marks the term Eden followed by the  descriptor quite dissimilar from Adam and Eden That footnote elevates similarity and only a component of similarity being the structure of marks above all other considerations. Nowhere in their decision did the  take the time to scrutinize the evidence of the  of the  of  because they did not find the family of  ultimately and so they did not go through that exercise. But on no less than four occasions in their paper talk about how the  strength that they perceived with respect to the supplement marks impacted the ultimate conclusion   So my friend here has cited the board's ultimate conclusion but beyond that it talks about how the weakness of the  buttressed its decision and not only that before it even talked about similarity it addressed the  because it expressly stated that similarity was influenced by the scope of rights that a mark was entitled to and let's see when discussing similarity again in the section on similarity its conclusion again was expressly based in part on the problem is the word buttressed means strengthened and so they've already they've made a holding before that then they say our conclusion is buttressed by the  weakness of the  so that goes to magnitude but not direction meaning they've already made a fact finding and then they say we've made this fact finding but that fact finding is even stronger when you consider strength so I don't think the problem is if even if they got the  part wrong it doesn't change the underlying fact finding and that's what they indicated in that footnote I read to you two things one is that they didn't consider   mark before even analyzing similarity because they acknowledged that the two were intertwined that is the first issue the second issue is that because of  erroneous finding on the first issue they                                                        truth